[Cite as *Polaris Owners Assn., Inc. v. Solomon Oil Co.*, 2015-Ohio-4948.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| POLARIS OWNERS ASSOCIATION, INC. | : | JUDGES: |
| | : | |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 14 CAE 11 0075 |
| | : | |
| SOLOMON OIL COMPANY, ET AL. | : | |
| | : | |
| | : | |
| Defendants-Appellants | : | O P I N I O N |


CHARACTER OF PROCEEDING: Appeal from the Delaware County Court of Common Pleas, Case No. 12 CVH 08 1015



JUDGMENT: AFFIRMED IN PART; REVERSED IN PART



DATE OF JUDGMENT ENTRY: November 23, 2015



APPEARANCES:

For Plaintiff-Appellee:

KIMBERLY WEBER HERLIHY
CHRISTOPHER C. WAGER
52 East Gay St.
P.O. Box 1008
Columbus, OH 43216-1008

For Defendants-Appellants:

DENNIS L. PERGRAM
50 North Sandusky St.
Delaware, OH 43015-1926

*Delaney, J.*

{¶1} Defendants-Appellants Solomon Oil Company and Solomon Realty Company, LLC appeal the July 16, 2014 and November 7, 2014 judgment entries of the Delaware County Court of Common Pleas.

## FACTS AND PROCEDURAL HISTORY

### A. Creation of Polaris Centers of Commerce

{¶2} Polaris Centers of Commerce is a commercial business, retail shopping, and restaurant area located along Interstate 77 in Delaware County, Ohio. It consists of approximately 1,026 acres. In 1980, Bob Echele, the founder of Polaris Centers of Commerce and the managing partner of N.P. Limited Partnership, developed a plan for a high-end, mixed-use business park that would be the Polaris Centers of Commerce. The current managing director of N.P. Limited Partnership is Franz Geiger. The development plan was memorialized in the Declaration of Protective Covenants adopted on August 20, 1992.

### B. Declaration of Protective Covenants

{¶3} The Declaration of Protective Covenants contains design standards for the businesses located within the Polaris Centers of Commerce territory. The owners of businesses within the Polaris Centers of Commerce are bound by the terms of the Declaration of Protective Covenants. Potential investors are provided with a copy of the Declaration of Protective Covenants. In this case, there is no dispute that Defendants-Appellants Solomon Oil Company and Solomon Realty Company, LLC are the owners of a business located in the Polaris Centers of Commerce and are bound by the Declaration of Protective Covenants.

{¶4}   The intent of the Declaration of Protective Covenants is:

in pursuance of a general plans for the protection, benefit and mutual advantage of all the Real Property and of the Persons who are now and may hereafter become Owners, * * *, the Declarant executes this Declaration for the purpose of subjecting the Real Property to all and each of the following restrictions, reservations, conditions, covenants, easements, rights-of-way, charges, assessments, agreements, obligations, rights, uses and provisions, all sometimes referred to herein as "Protective Covenants", which are for the mutual benefit and protection of, and shall be enforceable by, the Declarant, all and any of the present and future Owners * * * of any real property.

**1. Article One: Definitions of Terms**

{¶5}   Article One of the Declaration of Protective Covenants defines the terms used in the document. Relevant to this appeal, Article One defines the following:

Section 8. "Building Site" means a parcel of real estate located within the Polaris Centers of Commerce consisting of either a lot, portion of a lot, contiguous lots, or portion of contiguous lots, as applicable, but does not include Rights-of-Way, Common Property or Interchange Property.

Section 14. "Design Guidelines" means all of those guidelines and standards prepared by the Developer and its representatives * * *, and issued to the Design Review Committee describing and dictating the general considerations which must be undertaken by the Owner * * * in preparing and submitting an application for the construction of

Improvements on or within any Building Site, which standards and guidelines will be generally followed by the Design Review Committee in reviewing and approving or disapproving any such application. The Design Standards generally describe and incorporate specific requirements for Building Site maintenance, tree preservation, irrigation, landscaping, set back requirements, lot splits, general architecture, treatment of mechanical equipment, Service Areas and dumpsters, exterior building materials, colors, window treatments, outdoor furnishings, curb cuts, driveways, walkways, lighting, signage, etc. * * *.

Section 15. "Design Review Committee" means the entity responsible for conducting the Design Review Process and in certain limited instances, as specifically set forth herein for administering certain aspects of the Protective Covenants. * * *

**2. Article Two: General Character and Purposes**

{¶6} Article Two establishes the "General Character and Purposes" of the Protective Covenants. It states:

The purpose of these Protective Covenants is to insure insofar as possible that the POLARIS Centers of Commerce will be developed and maintained in accordance with high standards appropriate to the various land uses established within POLARIS Centers of Commerce. The general goal is to create and maintain efficient operation, maximum values and prosperity for the enterprises located with POLARIS Centers of Commerce. More particular goals include (i) excellence of design, both of

land use planning, site development and building; (ii) ease of access for employees and customers; (iii) compatibility of adjacent uses; (iv) effective and restrained signage; (v) outstanding landscaping, both design and maintenance; (vi) well designed lighting and (vii) adequate parking. These specific goals reflect conditions at the time these Protective Covenants were drafted in 1992. It is acknowledged that changing conditions and values may cause the list to be expanded and/or modified as appropriate to meet future standards of excellence. To help achieve the goal these Covenants provide for the establishment of a Design Review Committee and a Property Owners Association. * * *

{¶7}   Plaintiff-Appellee Polaris Owners Association was established pursuant to Article Two for the purposes of enforcing and administering the Declaration of Protective Covenants. The Polaris Owners Association is a non-profit group of owners associated with Polaris. Franz Geiger is the president of the Polaris Owners Association. The Design Review Committee is part of the Polaris Owners Association.

**3. Article Three: Design Review Committee**

{¶8}   Article Three establishes the Design Review Committee and outlines its duties. The duties of the Design Review Committee are to generally conduct the review and approval process as set forth in Article Five of the Protective Covenants. The Design Review Committee also enforces the Design Guidelines and the Protective Covenants.

**4. Article Four: Design Guidelines**

{¶9}   Article Four establishes the Design Guidelines for owners of businesses or properties within the Polaris Centers of Commerce. The purpose of the Design Guidelines is to "set forth and explain the particular standards and procedures pertaining to the development of the Improvements within POLARIS Centers of Commerce." The intent of the Design Guidelines "is to create well designed Building Sites, maintain consistent architecture with compatible use of colors and building materials, and provide codification of the procedures relating to the Design Review Process."

{¶10} The Design Review Guidelines is a separate document from the Declaration of Protective Covenants. It outlines the procedures necessary to obtain approval of improvements from the Design Review Committee. It states:

Deed Restrictions attached to all land with POLARIS require the submission of plans to the Design Review Committee ("Committee") prior to commencement of any construction on new or existing buildings. * * *

No work, whether new construction or a major or minor alteration of an existing building, including but not limited to signage and landscaping, may not begin until the Committee has approved the plans and use for a site. * * *

STANDARDS

FLAGS

* * *

CORPORATE FLAGS: FOR OFFICE BUILDINGS ONLY

* * *

DUMPSTERS

* * *

ARCHITECTURAL STANDARDS

POLARIS is a premier development in which great details should be given to design of building. Buildings should be consistent on all four sides. Services doors and utility banks should be painted to match the color of the back of the building. Natural and masonry materials are preferred. Monolithic looking structures and surfaces are discouraged. Exterior bright surfaces on dominant elevations are discouraged. Building design should be in harmony with a first class, mixed-use business park.

USES

Similar to building design, uses should be consistent with a first class, high end, mixed-use business park.

VARIANCES

* * *

Attached to the Design Review Guidelines is Exhibit A and B providing guidelines for signage and landscaping.

**5. Article Five: Design Review Process**

{¶11} Article Five outlines the Design Review Process. As echoed in the Design Guidelines, Section 1 states:

[n]o Improvement of any kind shall be installed, erected, placed, assembled, altered or permitted to remain on any Building Site until and unless its proposed use and the Plans and Specifications for construction of the same * * * have been first approved in writing by the Design Review Committee. Approval or disapproval shall be based, among other things, on conformity and harmony of the use, Plans and Specifications with the Design Guidelines, these Protective Covenants, adjacent buildings, and conformity of the same to the general character of POLARIS Centers of Commerce as described in Article Two hereof. * * *

**6. Article Six: Uses**

{¶12} Article Six states the "Restrictions on Use and Development." Relevant to this appeal, Article Six, Section 1 was amended effective April 24, 2007.

*a. Prohibited Uses*

{¶13} Section 1 outlines "uses" for building sites:

All Building Sites are to be used for offices, motels, hotels, retail and other uses as approved by the Design Review Committee ("DRC") consistent with these Protective Covenants. By way of example and not limitation, the following uses are deemed to be inconsistent with these Protective Covenants and are specifically prohibited ("Inconsistent Uses"):

(A) refining, smelting, mining operations or drilling * * *;

(B) manufacturing, assembly or industrial use;

(C) a mini-storage or self-storage facility or warehouse * * *;

(D) junkyard or a land fill * * *;

(E) stockyard, outdoor animal shelter * * * provided, however, this provision does not prohibit pet shops or pet supply stores;

(F) adult bookstore or cinema or other establishment selling or exhibiting pornographic materials where the primary use is the selling, distributing, dealing and/or exhibiting of such materials * * *;

(G) auto body or fender repair or paint shop * * *;

(H) mobile home park, trailer court * * *;

(I) coin operated laundries or laundromat or dry-cleaning plant * * *;

(J) any gambling facility or operation * * *;

(K) mental hospital * * *, rehab center, halfway house, community food pantry, * * *;

(L) permanent blood, blood plasma and organ banks * * *;

(M) flea market, pawn broker or pawn shop, consignment store * * * provided, however, this prohibition shall not be applicable to stores selling used goods such as "Once Upon a Child", "Play It Again Sports" or similar stores;

(N) facilities operated primarily for check cashing, cash or payroll advances or other such loans * * *;

(O) pool or billiard hall, bowling alley, amusement or video game arcade unless such uses are incidental to a restaurant or bar or directly

associated with a permitted use such as a theater, hotel or enclosed shopping mall * * *;

(P) drive-thru for beer, wine or liquor; and

(Q) churches, temples, mosques or other places or houses of worship * * *.

In the event of any questions related to the interpretation of this Section 1 including whether a specific use is permitted or prohibited hereunder, the DRC shall have the authority to determine such matters on behalf of the Association. Further, notwithstanding the other provisions of this Section 1 to the contrary, the DRC may, in its sole discretion, grant a variance under this Section 1 to permit the use of one or more Building Sites for one or more Inconsistent Uses except the Inconsistent Uses listed in Paragraphs A, D, E, F, H, K, L and M.

*b. Subdivision of Building Sites*

{¶14} Article Six, Section 27 of the Protective Covenants limits the "Right to Subdivide" a building site. It states:

Once a Building Site has been purchased or leased from the Developer, such real estate shall be considered as a single unit; and it shall not be resubdivided without the prior written approval of the Developer; provided, however, at such time as the Developer is required to assign over unto the Association the right to appoint the members of the Design Review Committee, the same shall also automatically act to assign the approval set forth with this Section over unto the Association.

### 7. Article Twelve: Attorney Fees

{¶15} Article Twelve of the Declaration of the Protective Covenants contains a provision for the payment of attorney fees. It states:

> In the event it shall be necessary to secure the services of an attorney to enforce the provisions of all or any of these Protective Covenants, then the fee of such attorney and all other costs in connection with any contemplated or actual legal proceeding in such connection shall become a lien against the Building Site * * * if such proceedings establish the Building Site is in violation of these Protective Covenants. * * *

## C. Solomon Oil Company

### 1. Terms of the Lease

{¶16} In May 1998, Jacqueline K. Solomon, president of Solomon Oil Company, entered into a lease agreement with N.P. Limited Partnership. Solomon leased the property located at 1555 Polaris Parkway to "use the premises for the purpose of constructing, operating and maintaining a co-branded automobile service station and quick-service restaurant and related uses (together with such buildings and improvements as Lessee deems necessary therefor, * * *)." The lease stated Solomon and N.P. Limited expressly agreed that Solomon would not use the Property for anything other than the retail sale of gasoline and food "together with such other products or services consistent with a first class, high quality co-branded automobile service station and quick service restaurant." The lease specified that N.P. Limited or the Design Review Committee had the right to review and approve or disapprove of

Solomon's plans and specifications for improvements to the property. The Declaration of Protective Covenants was attached to the lease agreement as Exhibit A.

### 2. Building Site

{¶17} The October 4, 1999 plans show an accessory building located behind the service station and the quick-service restaurant. The plans refer to the accessory building as a self-service car wash approximately 1,000 square feet in size.

{¶18} Solomon constructed a Marathon Oil gas station, a convenience store named Jacquie's Market and an A & W Restaurant.

{¶19} An accessory building, which is the subject of this case, was constructed and initially used as self-service car wash. The accessory building was painted the same colors as the gas station: white, blue, and red.

### 3. Solomon Purchased the Property

{¶20} On January 10, 2005, Solomon exercised its option to purchase the property. Solomon Oil Company acquired the property from N.P. Limited through a limited warranty deed. Solomon Realty Company, LLC acquired title to the property from Solomon Oil Company. At trial, there was no evidence presented whether the deed included the same restrictions of the use of the property as included in the terminated lease.

## D. Change of Use by Solomon

### 1. State Liquor Agency

{¶21} While Solomon was bound under the terms of the lease agreement, N.P. Limited and Polaris Owners Association brought suit against Solomon for its violation of the Declaration of the Protective Covenants. In August 2002, Solomon applied for and

was awarded a contract to operate a state liquor agency on the property. Solomon submitted plans to the Design Review Committee for approval of the alterations to operate the state liquor agency, but it did not obtain approval to perform the alterations. Polaris Owners Association sought an injunction to prevent Solomon from operating a state liquor agency. The Delaware County Court of Common Pleas found on October 28, 2004 that Solomon was in violation of Article Five, Section 1 of the Declaration of Protective Covenants and enjoined it from further violations of the Declarations of Protective Covenants. *See Polaris Owners Association v. Solomon Oil Co.*, Delaware County Court of Common Pleas, Case No. 02 CVH-12-742.

### 2. Beer and Wine Drive-Thru

{¶22} In 2005, Solomon converted the car wash into a beer and wine drive-thru. Solomon converted the car wash to a beer and wine drive-thru without approval of the Design Review Committee. The Design Review Committee notified Solomon that the change of use of the accessory building from a car wash to a beer and wine drive-thru was in violation of the Protective Covenants because the use was not consistent with a first class, high-end mixed use business park and the use was unrelated to the building site. Effective April 24, 2007, Polaris Owners Association voted to amend the Declarations of Protective Covenants and made a beer and wine drive-thru a prohibited use. Solomon converted the drive-thru back to a car wash.

### 3. The Gun Shop

{¶23} In June 2012, Solomon began altering the accessory building with the intention of operating it as a retail business that exclusively sold guns to the general public. Solomon obtained permits from the City of Columbus to alter the building and

obtained federal licensing to operate a gun shop. The front of the building was converted from a drive-thru opening to a front door and a garage door was placed at the rear of the building. A new parking area was constructed. The building was painted dark green and black.

{¶24} It is undisputed that Solomon did not submit an application to the Design Review Committee for approval before it began the alterations to the accessory building as to the change in appearance and change in use.

{¶25} Solomon's Gun Shop opened for business on August 25, 2012.

### 4. Other Alterations

{¶26} Solomon also altered the drive-thru portion of the building located at the front of the building to operate the "Five Star Espresso Lounge." Solomon placed new signage on the building. She constructed a patio. Solomon made the alterations without first obtaining approval of the Design Review Committee.

### E. Action by Polaris Owners Association

### 1. Letters to Solomon

{¶27} Employees with Polaris Owners Association observed that Solomon made changes to the accessory building. The manager of the Design Review Committee notified Solomon by letter on June 25, 2012 that such changes were not approved by the Design Review Committee and any alternations must be approved by the Design Review Committee. Solomon did not respond to the letter.

{¶28} On August 3, 2012, Polaris Owners Association notified Solomon by letter that it was in violation of the Declaration of Protective Covenants for altering the use of

the accessory building without approval of the Design Review Committee. Solomon did not respond to the letter.

### 2. Permanent Injunction and Declaratory Relief

{¶29} On August 28, 2012, Polaris Owners Association filed a verified complaint seeking declaratory judgment and a preliminary and permanent injunction against Solomon. It requested the trial court to issue a declaratory judgment that the Declaration of Protective Covenants was enforceable against Solomon and that Solomon may not operate a gun shop without the approval of the Design Review Committee. Polaris Owners Association moved for a preliminary and permanent injunction to prevent the change of use of the accessory building to a gun shop without the approval of the Design Review Committee.

{¶30} Polaris Owners Association also requested the trial court order Solomon to remove any changes to the related buildings not approved by the Design Review Committee, such as changes to the Five Star Espresso Lounge, to the monument sign, and signage on the property.

{¶31} The trial court held a hearing on the preliminary injunction. The trial court granted the preliminary injunction on August 31, 2012. The injunction prevented Solomon from operating a gun shop in the accessory building.

### F. Response by Solomon

{¶32} After the trial court issued the preliminary injunction, Solomon filed an application with the Design Review Committee to change the use of the accessory building to a gun shop. It also sought approval for other signage, painting, and landscaping changes on the property.

**1. Design Review Committee Disapproves the Plans**

{¶33} On September 20 and 25, 2012, the members of the Design Review Committee met to review the plans submitted by Solomon for the change of use of the accessory building to a gun shop. On October 5, 2012, the Design Review Committee sent Solomon Oil a letter explaining the committee met on September 20, 2012 and reviewed the plans submitted for the property. The letter stated:

1. <u>Solomon's Gun Shop</u>: While you did not expressly requests approval for a change of use for the rear building, the DRC finds that you are indeed changing the use and denies that change of use. * * * The introduction of an unrelated retail use in an accessory building does not reflect the goal of "excellence of design, both of land use planning, site development and building" as prescribed by Article II of The Protective Covenants, nor is this use "consistent with a first class, high end, mixed-use business park," as required by the standards set for in the Design Guidelines.

{¶34} The letter went on to state the issues the DRC found with the exterior paint colors, signage, patio furniture, and landscaping for Solomon's Gun Shop, Five Star Espresso Lounge, and Jacquie's Market. The DRC instructed that Solomon could resubmit items to be presented at the next DRC meeting. Solomon was encouraged to meet with the DRC architectural consultant to develop the appropriate color scheme, signage, and other design plans in a comprehensive, consistent plan that will likely be acceptable to the DRC. The DRC gave Solomon one year to comply with the Protective Covenants and Design Guidelines.

### 2. Solomon Files Counterclaim

{¶35} On November 16, 2012, Solomon filed a restated answer and supplemental counterclaim alleging the action of the Design Review Committee to disapprove of the change of use was unreasonable, arbitrary, and capricious and was not made in good faith and against public policy.

## G. Trial Court Judgment

{¶36} The matter came on for a bench trial on May 21, 2013 through May 24, 2013.

### 1. Declaratory Judgment and Permanent Injunction

{¶37} On July 16, 2014, the trial court issued its judgment, finding Solomon was in violation of the Declaration of Protective Covenants. It issued a permanent injunction restraining Solomon from changing the use of the accessory building to a gun shop; from operating, advertising, or promoting the gun shop; and from further alterations to the property without the approval of the Design Review Committee. The trial court further ordered Solomon to return the property to the condition previously approved by the Design Review Committee as it related to the monument sign and the Five Star Espresso Lounge. It denied Solomon's counterclaims. Solomon appeals this judgment.

### 2. Attorneys Fees

{¶38} Polaris Owners Association also requested attorney fees pursuant to Article Twelve of the Declaration of Protective Covenants. A hearing on attorney fees was held on September 15, 2014.

{¶39} On November 7, 2014, the trial court awarded Polaris Owners Association attorneys fees in the amount of $130,339.00 and $6,782.77 in costs. Solomon appeals this judgment.

## ASSIGNMENTS OF ERROR

{¶40} Solomon raises four Assignments of Error:

{¶41} "I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING A DECLARATORY JUDGMENT IN FAVOR OF POLARIS ON ITS COMPLAINT FOR DECLARATORY JUDGMENT AND BY THEN ISSUING A PERMANENT INJUNCTION AS A RESULT OF THE SAME.

{¶42} II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN NOT GRANTING DECLARATORY RELIEF TO SOLOMON REALTY ON ITS COUNTERCLAIM.

{¶43} III. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DETERMINING THAT POLARIS WAS LEGALLY ENTITLED TO ATTORNEY FEES.

{¶44} IV. ASSUMING, ARGUENDO, THAT POLARIS WAS LEGALLY ENTITLED TO SOME ATTORNEYS' FEES, THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING THE AMOUNT OF FEES IT AWARDED."

## ANALYSIS

### A. Declaratory Judgment

{¶45} Solomon argues the trial court erred in granting declaratory judgment in favor of Polaris Owners Association and denying declaratory judgment against Solomon. Because these arguments are interrelated, we will consider them together.

**1. Standard of Review**

{¶46} This matter came before the court upon complaints for declaratory judgment (and Polaris's motion for permanent injunction). A declaratory judgment action is a civil action and provides a remedy in addition to other legal and equitable remedies available. *Fagan v. Boggs*, 4th Dist. Washington No. 10CA17, 2011-Ohio-5884, ¶ 13 citing *Aust v. Ohio State Dental Bd.*, 136 Ohio App.3d 677, 681, 737 N.E.2d 605 (10th Dist.2000).

{¶47} The trial court conducted a bench trial on this case. As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *Peterson v. Peterson,* 5th Dist. No. CT2003–0049, 2004–Ohio–4714, ¶ 10, citing *Cross Truck v. Jeffries,* 5th Dist. No. CA–5758, 1982 WL 2911 (Feb. 10, 1982). Questions of law are reviewed by the court de novo. *Erie Ins. Co. v. Paradise,* 5th Dist. No.2008CA00084, 2009–Ohio–4005, ¶ 12.

{¶48} In *Eastley v. Volkman,* 132 Ohio St.3d 328, 2102–Ohio–2179, 972 N.E.2d 517, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case. *SST Bearing Corp. v. Twin City Fan Companies, Ltd.,* 1st Dist. No. C110611, 2012–Ohio–2490, ¶ 16. The Ohio Supreme Court held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), is also applicable in civil cases. *Eastley,* at ¶ 17–19. A reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences,

consider the credibility of witnesses, and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley,* at ¶ 20 quoting *Twearson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001); *See also Sheet Metal Workers Local Union No. 33 v. Sutton,* 5th Dist No. 2011 CA00262, 2012–Ohio–3549 citing *State v.. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶49} "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley,* at ¶ 19.

{¶50} Restrictive covenants in deeds are generally interpreted by those rules used to interpret contracts. *Cumberland Trail Homeowners' Assn., Inc. v. Kinietz*, 5th Dist. Licking No. 11-CA-72, 2012-Ohio-2906, ¶ 23 citing *McBride v. Behrman,* 28 Ohio Misc. 47, 50, 272 N.E.2d 181 (1971). In the case of contracts, deeds, or other written instruments, the construction of the writing is a matter of law, which is reviewed de novo. *See*, *Martin v. Lake Mohawk Property Owner's Ass'n.,* 5th Dist. No. 04 CA 815, 2005–Ohio–7062, ¶ 23, citing *Long Beach Assn., Inc. v. Jones,* 82 Ohio St.3d 574, 576, 697 N.E.2d 208 (1998). Under a de novo review, an appellate court may interpret the language of the contract substituting its interpretation for that of the trial court. *Witte v. Protek Ltd.,* 5th Dist. No.2009CA00230, 2010–Ohio–1193, ¶ 6, citing *Children's Medical Center v. Ward,* 87 Ohio App.3d 504, 622 N.E.2d 692 (1993).

**2. Restrictions on Use of Property**

{¶51} Ohio's law" does not favor restrictions on the use of property." *Driscoll v. Austintown Assoc.,* 42 Ohio St.2d 263, 276, 328 N.E.2d 395 (1975). "The general rule, with respect to construing agreements restricting the use of real estate, is that such agreements are strictly construed against limitations upon such use, and that all doubts should be resolved against a possible construction thereof which would increase the restriction upon the use of such real estate." *Bove v. Geibel,* 169 Ohio St.3d 125, 159 N.E.2d 425 (1959), paragraph one of the syllabus. Furthermore, "[i]f the covenant's language is indefinite, doubtful, and capable of contradictory interpretations, the court must construe the covenant in favor of the free use of land." *Farrell v. Deuble,* 175 Ohio App.3d 646, 2008–Ohio–1124, 888 N.E.2d 514 (9th Dist.), ¶ 11, citing *Houk v. Ross,* 34 Ohio St.2d 77, 296 N.E.2d 266 (1973), paragraph two of the syllabus.

{¶52} The Declaration of Protective Covenants states its purpose is to maintain "a first class, high end, mixed-use business park." The Ohio Supreme Court has held, "[w]here an owner of land has adopted a general building scheme or plan for the development of a tract of property, designed to make it more attractive for residential purposes by reason of certain restrictive agreements to be imposed upon each of the separate lots sold, embodying the same in each deed, such agreements will generally be upheld provided the same are not against public policy." *Dixon v. Van Sweringen Co.,* 121 Ohio St. 56, 166 N.E. 887 (1929), paragraph one of syllabus. In *Goutras v. Dillon–McDonald,* 5th Dist. Stark No. CA–8349, 1991 WL 207949, *2 (Sept. 30.1991), this court held:

A restriction merely requiring submission and approval of building plans may be valid.

In order that a restrictive covenant requiring the submission to and approval of the grantor of plans for the erection of a dwelling may be valid and enforcible [sic], such covenant must be used (1) in connection with some general plan or scheme of which the grantee has notice, or (2) some other designated or stated restriction within which such approval may operate, or (3) the covenant must contain some criterion or limitation regulating the scope of such approval. *Carranor Woods Property Owners' Assn. v. Driscoll* (1957), 106 Ohio App. 95, paragraph three of the syllabus.

*See also Samsa v. Hess*, 5th Dist. Tuscarawas No. 2014 AP 0008, 2015-Ohio-1319, ¶ 24.

{¶53} We consider Solomon's arguments under these common law guidelines.

**3. Approval by the Design Review Committee Required by the Covenants**

{¶54} The Declaration of Protective Covenants and Design Review Guidelines state:

Deed Restrictions attached to all land with POLARIS require the submission of plans to the Design Review Committee ("Committee") prior to commencement of any construction on new or existing buildings. * * *

No work, whether new construction or a major or minor alteration of an existing building, including but not limited to signage and

landscaping, may begin until the Committee has approved the plans and

use for a site.

{¶55} The above language is clear and unambiguous that an owner must submit her plans to the Design Review Committee before she commences any construction as to new or existing buildings. In this case, there is no factual dispute that Solomon did not submit plans to the Design Review Committee before it commenced construction on the accessory building. After the commencement of the present litigation, Solomon submitted plans to the Design Review Committee for their review of the already completed construction of the gun shop.

{¶56} Solomon's failure to submit the plans for the accessory building before it commenced work on the accessory building was in violation of the Declaration of Protective Covenants and Design Review Guidelines.

**4. The Gun Shop is an Unrelated Use on the Building Site**

{¶57} The trial court determined the change of use of the accessory building was in violation of the Declaration of Protective Covenants because it was an unrelated use to the building site. We agree with the trial court's conclusion.

{¶58} We recently reaffirmed our reliance on *Carranor Woods Property Owners' Assn. v. Driscoll*, 106 Ohio App. 95, 153 N.E.2d 681 (6th Dist.1957), to determine whether a restrictive covenant is enforceable. The case law stated:

In order that a restrictive covenant requiring the submission to and

approval of the grantor of plans for the erection of a dwelling may be valid

and enforcible [sic], such covenant must be used (1) in connection with

some general plan or scheme of which the grantee has notice, or (2) some

other designated or stated restriction within which such approval may operate, or (3) the covenant must contain some criterion or limitation regulating the scope of such approval.

*Id.* at paragraph three of the syllabus. The language of the restrictive covenant, however, cannot be indefinite, doubtful, or capable of contradictory interpretations.

{¶59} A review of the Declaration of Protective Covenants shows that it makes numerous references to the importance of "related use" to the purpose and goals of the development of the Polaris Centers of Commerce. Article Two describes the character and purpose of the Declaration of Protective Covenants is to develop the Polaris Centers of Commerce in accordance with high standards appropriate to the various land uses established in the area. It states the particular goals include "(i) excellence of design, both of land use planning, site development and building; [and] (iii) compatibility of adjacent uses." The Design Review Committee and Property Owners Association were established for the achievement of those purposes and goals. Article Four establishes the Design Guidelines for the owners of businesses or properties with the Polaris Centers of Commerce. The intent of the Design Guidelines "is to create well designed Building Sites, maintain consistent architecture with compatible use of colors and buildings materials." Article Five of the Protective Covenants outlines the Design Review Process. It states that approval or disapproval of the Design Review Committee "shall be based, among other things, on conformity and harmony of the use, Plans and Specifications with the Design Guidelines, these Protective Covenants, adjacent buildings, and conformity of the same to the general character of POLARIS Centers of Commerce."

{¶60} The Declaration of Protective Covenants defines "building site" as: "a parcel of real estate located within the Polaris Centers of Commerce consisting of either a lot, portion of a lot, contiguous lots, or portion of contiguous lots, as applicable, * * * " Article Six, Section 27 of the Protective Covenants states that once a building site has been purchased from the developer, such real estate shall be considered a single unit. There is no dispute that the Solomon Property consisting of the gas station and accessory building is one "building site" pursuant to the definition in the Declaration of Protective Covenants.

{¶61} A review of the evidence shows that Solomon was aware or should have been aware that the Declaration of Protective Covenants and Design Guidelines, through approval by the Design Review Committee, required the use of the accessory building to be related to the use of the existing building site. When Solomon originally leased the building site from N.P. Limited Partnership, the lease stated the building site was to be used "for the purpose of constructing, operating and maintaining a co-branded automobile service station and quick-service restaurant and related uses (together with such buildings and improvements as Lessee deems necessary therefor, * * *). Included in the construction plans was an accessory building to the rear of the gas station that was to be used as a car wash. Solomon painted the accessory building the same colors as the gas station. It initially used the accessory building as a car wash.

{¶62} In 2005, after it had purchased the property, Solomon converted the car wash to a beer and wine drive-thru without first seeking approval from the Design Review Committee. The Design Review Committee notified Solomon it was in violation

of the Declaration of Protective Covenants because the use of the accessory building as a beer and wine drive-thru was an unrelated use to the other uses on the building site.

{¶63} In 2012, Solomon converted the accessory building into a gun shop. After the within lawsuit was commenced, Solomon submitted plans for the change of use of the accessory building to the Design Review Committee, which rejected the plans. The Design Review Committee stated in its letter to Solomon rejecting the plans that, "[t]he introduction of an unrelated retail use in an accessory building does not reflect the goal of 'excellence of design, both of land use planning, site development and building' as prescribed by Article II of The Protective Covenants, nor is this use 'consistent with a first class, high end, mixed-use business park,' as required by the standards set for in the Design Guidelines."

{¶64} The Design Review Committee rejected the use of the accessory building as a gun shop because the Committee determined it was an unrelated retail use in an accessory building. At trial, the committee members testified to their reasoning for rejecting the plans for the change of use of the accessory building. Dawn Barkley testified she did not believe the proposal made by Solomon was consistent with a first class, high end mixed-use business park because "she [Solomon] was putting something totally unrelated to her business, adding in a separate business onto her property. * * * Gun shop has absolutely nothing to do with her gas station and the espresso lounge, she's changing the use from what was a service to retail." (Trial Trans., Vol. II, p. 220). Steve Pagura of the Design Review Committee testified he thought converting the car wash to a gun shop was not consistent with a first class, high end mixed-use business park because he had concerns with the parking and the

aesthetics of the architecture being compatible with the original build. (Trial Trans., Vol. II., p. 261). John V. Heilman testified that one of his concerns was the proposed gun shop was that it would not relate to family entertainment that Polaris strives to have. (Trial Trans., Vol. II, p. 288). He further felt that the gun shop was not a related use to the gas station. (Trial Trans., Vol. 11, p. 300).

{¶65} The record supports the trial court's conclusion that Solomon's change of use of the accessory building to the gun shop was in violation of the Declaration of Protective Covenants. The Declaration of Protective Covenants clearly and unambiguously promoted the importance of the compatibility of adjacent uses within the Polaris Centers of Commerce. Solomon was aware of the standard within the Declaration of Protective Covenants that the use of the accessory building must be related to the use of the existing building site because the Design Review Committee previously determined Solomon's use of the accessory building as a beer and wine drive-thru was impermissible because it was not related to the use of the existing building site. The testimony of the Design Review Committee showed that their determination to reject the plans for the accessory building was because the gun shop was not a related use to the gas station.

{¶66} Further, by owning property in the Polaris Centers of Commerce, which binds the property through the Declaration of Protective Covenants, Solomon agreed to be bound by the authority of the Design Review Committee for matters within the Design Review Guidelines. Article Six, Section 1 states:

In the event of any questions related to the interpretation of this Section 1

including whether a specific use is permitted or prohibited hereunder, the

DRC shall have the authority to determine such matters on behalf of the Association. Further, notwithstanding the other provisions of this Section 1 to the contrary, the DRC may, in its sole discretion, grant a variance under this Section 1 to permit the use of one or more Building Sites for one or more Inconsistent Uses except the Inconsistent Uses listed in Paragraphs A, D, E, F, H, K, L and M.

{¶67} Upon this record, we affirm the trial court's judgment to grant the declaratory judgment of Polaris Owners Association and deny Solomon's declaratory judgment.

### 5. Restrictive Covenants as to Color, Signage, and Landscaping are Valid

{¶68} The Design Review Committee also rejected Solomon's plans for color, signage, and landscaping. The focus of Solomon's arguments on appeal was the use of the accessory building as a gun shop. Our review of the Declaration of Protective Covenants and Design Review Guidelines shows that the standards for signage and landscaping are set out in clear and unambiguous detail.

{¶69} We find no error as to the application of the Declaration of Protective Covenants and Design Review Guidelines as to color, signage, and landscaping.

### 6. Other Violations

{¶70} In the trial court's July 16, 2014 judgment entry, the trial court ordered Solomon to restore the monument sign to the prior approved condition; remove all unapproved signage from the property, including the product name signage at the Five Star Espresso Lounge; and remove the patio at the Five Star Espresso Lounge.

{¶71} Solomon argues the trial court erred in ordering Solomon to remove the patio because Polaris Owners Association never raised the issue in its verified complaint or motion for preliminary injunction in regards to the patio at the Five Star Espresso Lounge. Our review of the verified complaint filed on August 28, 2012 by Polaris Owners Association finds there is no mention of removal of the patio at the Five Star Espresso Lounge.

{¶72} Polaris Owners Association states that while the patio is not mentioned in the verified complaint, the patio was mentioned in the Design Review Committee letter to Solomon. The letter stated, "Finally, the patio installed for the Espresso Lounge was never approved. Please submit plans for this patio to the DRC promptly." In the prayer for relief of the verified complaint, Polaris Owners Association requested the trial court to "[o]rder Defendants to remove from the Property, and restore the Property to its condition prior to, any changes in use or alterations not approved by the Design Review Committee, including but not limited to * * * (2) changes or alterations related to the operation of the Espresso Lounge." At trial, Franz Geiger testified on behalf of Polaris Owners Association that it was requesting Solomon submit for approval the patio that was placed on the property without approval. (Trial Trans., Vol. I, p. 103). Polaris Owners Association does not point to any other evidence in the record as to the removal of the patio.

{¶73} Upon this record, we find the trial court's conclusion that Solomon must remove the patio is not supported by competent and credible evidence. We find the record supports the request for Solomon to resubmit plans for the patio to the Design Review Committee.

**7. Declaratory Judgment in favor of Polaris Owners Association is affirmed in part and reversed in part**

{¶74} Based on our above analysis, we sustain in part and overrule in part the first and second Assignments of Error of Solomon.

**B. Attorneys Fees**

{¶75} Solomon argues in its third and fourth Assignments of Error that the trial court erred when it awarded attorneys fees and costs to Polaris Owners Association.

{¶76} Article Twelve of the Declaration of Protective Covenants permits Polaris Owners Association to seek attorneys fees and costs if it is necessary to enforce the Declarations of Protective Covenants.

**1. Polaris Owners Association May Seek Attorneys Fees**

{¶77} In the trial court's November 7, 2014 judgment entry as to attorneys fees, the trial court determined Polaris Owners Association was entitled to recover reasonable attorneys fees incurred in the case for the purpose of enforcing the Declaration of Protective Covenants. The trial court found the parties stipulated on August 31, 2012 that Solomon's property was covered by the restrictive covenants, which resolved the declaratory judgment issue.

{¶78} Pursuant to this court's decision in *Morgan Woods Homeowners' Assoc. v. Wills*, 5th Dist. Licking No. 11 CA 57, 2012-Ohio-233, ¶ 61-62, we find that while Polaris Owners Association brought the action as a declaratory judgment, it may pursue attorneys fees because they were incurred for the purpose of enforcing restrictive covenants:

In *Ashwood Homeowners' Assn. v. Reitor,* 12th Dist. No. CA2003–06–142, 2004–Ohio–3536, the plaintiff, Ashwood Homeowners' Association, commenced a declaratory judgment action against the defendant, a resident and member of the Association. The Association sought a declaratory judgment, pursuant to R.C. § 2721.03, that the defendant was in violation of provisions of the "Declaration of Covenants, Conditions, Restrictions, and Reservations of Easements for Ashwood Home Owners' Association". The trial court in *Ashwood* granted summary judgment in favor of the Association, finding that the defendant had violated a restrictive covenant under the Homeowners' Declaration. The trial court also granted the Association's motion for attorney fees. On appeal, the defendant argued that the trial court erred in granting attorney fees to the Association on the basis that attorney fees are precluded pursuant to R.C. § 2721.16 because declaratory relief was sought. The Appellate Court rejected the defendant's contention, holding that R.C. § 2721.16 did not preclude the award of attorney fees because the action involved the enforcement of restrictive covenants (i.e., not a claim for declaratory relief), and thus the Association was entitled to recover attorney fees pursuant to Article VII, Section 7.4.4 of the Homeowners' Declaration.

As the attorney fees incurred by Appellee in this case were for the purpose of enforcing the restrictive covenants of Morgan Woods, we find

that the trial court did not err in finding that Appellee was entitled to recover attorney fees.

*See also Kurtz v. W. Property, L.L.C.*, 10th Dist. Franklin No. 10AP-1099, 2011-Ohio-6726.

{¶79} Solomon's third Assignment of Error is overruled.

**2. The Amount of Attorneys Fees and Costs is Affirmed**

{¶80} In Solomon's fourth Assignment of Error, it argues the trial court abused its discretion in the amount of attorneys fees it awarded.

{¶81} The trial court determined Polaris Owners Association was entitled to recover reasonable attorneys fees and costs incurred after August 31, 2012 for the enforcement of the restrictive covenants against Solomon's property. The trial court's November 7, 2014 judgment entry awarded $130,339.00 in attorneys fees and $6,782.77 in costs to Polaris Owners Association.

{¶82} In *Landmark Disposal, Ltd. v. Byler Flea Mkt.*, 5th Dist. Stark Nos.2005CA00291, 2005CA00294, 2006–Ohio–3935, ¶¶ 13–15, we reviewed the standard by which a trial court is to determine a reasonable amount of attorneys' fees:

> The starting point in determining the amount of fees to award under the statute is the computation of the lodestar figure. *Blum v. Stenson* (1984), 465 U.S. 886, 888,104 S.Ct. 1541, 1543–1544, 79 L.Ed.2d 891, 895–896; *Hensley v. Eckerhart* (1983), 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40. The lodestar is the number of hours expended multiplied by a reasonable hourly rate. *City of Burlington v. Dague* (1992), 505 U.S. 557, 559–561, 112 S.Ct. 2638, 2640, 120 L.Ed.2d 449, 454–456; *Blum*, 465

U.S. at 888; *Hensley*, 461 U.S. at 433. If the court deviates from the lodestar, it must provide a clear explanation. *Hensley*, 461 U.S. at 437.

{¶83} To establish the number of hours reasonably expended, the party requesting the award of attorney fees "should submit evidence supporting the hours worked...." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. The number of hours should be reduced to exclude "hours that are excessive, redundant, or otherwise unnecessary" in order to reflect the number of hours that would properly be billed to the client. *Id*. at 434, 103 S.Ct. at 1939–40. A reasonable hourly rate is defined as "the 'prevailing market rate in the relevant community.' " *Blum*, 465 U.S. at 895.

{¶84} Once the trial court calculates the lodestar figure, the court may modify that calculation by application of the factors listed in DR 2–106(B). *Bittner v. Tri–County Toyota, Inc.*, 58 Ohio St.3d 143, 145, 569 N.E.2d 464 (1991). These factors are: the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent. Not all factors may be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation. Id.

{¶85} The party requesting an award of attorney fees bears the burden "to produce satisfactory evidence—in addition to the attorney's own affidavit—that the requested rate [is] in line with those prevailing in the community for similar services by

lawyers of reasonably comparable skill, experience, and reputation." *TCF Natl. Bank v. Williams*, 5th Dist. Stark No. 2009CA00102, 2010–Ohio–1487, ¶ 26 quoting *Blum v. Stenson*, supra 465 U.S. at 895 n. 11.

{¶86} A determination of whether to award attorney fees and the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court shall not interfere. *Bittner*, *supra* at 146, 569 N.E.2d 464. (Citation omitted).

{¶87} Upon a review of the evidence presented at the hearing, we find the trial court did not abuse its discretion in determining Polaris Owners Association was entitled to attorneys' fees in the amount of $130,339.00 and costs in the amount of $6,782.77.

## CONCLUSION

{¶88} The judgments of Delaware County Court of Common Pleas are affirmed in part and reversed in part.

By: Delaney, J.,

Hoffman, P.J. and

Farmer, J., concur.