[Cite as *Capital City Community Urban Redevelopment Corp. v. Columbus*, 2016-Ohio-8266.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Capital City Community Urban Redevelopment Corporation et al., | : | |
| | : | |
| Plaintiffs-Appellants, | : | |
| | : | No. 15AP-943 |
| v. | | (C.P.C. No. 13CVH01-833) |
| | : | |
| City of Columbus et al., | | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

---

D E C I S I O N

Rendered on December 20, 2016

---

**On brief:** *Fred J. Milligan*, for appellants. **Argued:** *Fred J. Milligan*.

**On brief:** *Crabbe, Brown & James LLP*, *Robert C. Buchbinder*, and *Christina L. Corl*, for appellees Columbus Association for the Performing Arts and Lincoln Theatre Association. **Argued:** *Daniel J. Hurley*.

**On brief:** *Richard C. Pfeiffer, Jr.,* City Attorney, and *Paula J. Lloyd*, for appellee, City of Columbus.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiffs-appellants, Capital City Community Urban Redevelopment Corporation ("Capital City") and Charles L. Adrian, appeal a judgment in favor of defendants-appellees, the City of Columbus ("city"), the Lincoln Theatre Association, and

the Columbus Association for the Performing Arts ("CAPA").  For the following reasons, we affirm that judgment.

{¶ 2}   The Lincoln Theatre is a performing arts center located in the King-Lincoln District of Columbus, Ohio.  Initially opened in 1928, the Lincoln Theatre suffered significant deterioration over the decades.  In 1991, Capital City purchased the theatre to save it from demolition.  At that time and subsequently, Adrian has served as president of Capital City.

{¶ 3}   In 2002, Capital City agreed to sell the Lincoln Theatre to Columbus Urban Growth Corporation ("Columbus Urban Growth").  Capital City and Columbus Urban Growth executed a "Real Estate Purchase and Sale Agreement," which, in relevant part, provided:

> 9. **Buyer's Representations and Warranties.**  Buyer hereby makes the following representations and warranties for the benefit of Seller and Seller's successors and assigns, which are true as of the date of this Agreement (except as otherwise hereinafter provided), which shall be true as of the Closing and which shall survive the Closing.
>
> (a)  The Buyer agrees to provide Saturday movies for children once the theater is operational, and for as long as feasible. The cost is to be $1.00 or less for a double feature.
>
> (b)  A bronze plaque is to be permanently installed and maintained, on the front of the Property.  The size, text, and location of the plaque on the building may be selected by Charles L. Adrian and will be architecturally consistent with the Long Street façade of the Property.

(Pls.' Ex. C.)

{¶ 4}   Capital City conveyed ownership of the Lincoln Theatre to Columbus Urban Growth by a general warranty deed.  That deed specified that the conveyance was subject to the provisions of paragraph nine of the Real Estate Purchase and Sale Agreement.

{¶ 5}   In 2004, Columbus Urban Growth conveyed ownership of the Lincoln Theatre to the city by limited warranty deed.  That deed specified that the conveyance was subject to conditions and restrictions of record.

{¶ 6}   Written communication between city officials demonstrated that the city knew about the obligations imposed by paragraph nine prior to the city's purchase of the

Lincoln Theatre. Nevertheless, after the city acquired the theater, city officials removed the bronze plaque that Adrian had affixed to the front of the theater. Adrian mounted a second plaque, which the city also removed.

{¶ 7} Frustrated with the city's actions, Adrian, along with Capital City, filed suit against the city and Columbus Urban Growth. In their fourth amended complaint, plaintiffs asked the trial court to issue a declaratory judgment that paragraphs 9(a) and 9(b) of the Real Estate Purchase and Sale Agreement were binding on the city and Columbus Urban Growth. The trial court refused to do so.

{¶ 8} On appeal, we concluded that paragraphs 9(a) and 9(b) constituted restrictive covenants that ran with the land. *Capital City Community Redevelopment Corp. v. Columbus*, 10th Dist. No. 08AP-769, 2009-Ohio-6835, ¶ 19, 23. When Columbus Urban Growth sold the theater to the city, the city assumed the obligations set forth in paragraphs 9(a) and 9(b). *Id.* at ¶ 19, 23, 32. The city, therefore, had a legal duty to fulfill those obligations.

{¶ 9} In the course of our review, we considered whether paragraph 9(a) was ambiguous. We stated:

> We also note that the trial court commented that the covenant in paragraph 9(a) could not run with the land because it was ambiguous. The court wondered whether "Saturday movies" meant every Saturday, and questioned what "for as long as feasible" meant. However, we find no ambiguity, and any ambiguity that might exist is for future concern. "Saturday movies" means precisely what it says: $1 children's movies must be shown on Saturdays. With regard to the phrase "for as long as feasible," the definition of this phrase is for interpretation by the city. If any party disagrees with the city's definition at some point in the future, appropriate action may be taken to determine the definition of this phrase.

*Id.* at ¶ 17.

{¶ 10} On remand, the trial court entered a declaratory judgment in plaintiffs' favor. Issued August 5, 2010, the judgment stated:

> [P]aragraphs 9(a) and 9(b) in the purchase contract between plaintiff Capital City and defendant Columbus Urban Growth are real covenants running with the land and are binding on defendant City of Columbus and that defendant City of Columbus shall perform its obligations under those

provisions, as set forth in the [December 24, 2009] decision of
the Tenth District Court of Appeals.

(Pls.' Ex. A.)

{¶ 11} During the pendency of plaintiffs' declaratory judgment action, efforts proceeded to reconstruct the Lincoln Theatre. The Lincoln Theatre Association was formed, and the city leased the theater to the Lincoln Theatre Association for a 99-year term. The city also ceded to the Lincoln Theatre Association the rights to manage, operate, and use the theater. The Lincoln Theatre Association then engaged CAPA to oversee day-to-day management of the theatre.

{¶ 12} In 2009, after extensive reconstruction, the Lincoln Theatre reopened. The reconstructed Lincoln Theater possessed the equipment and facilities necessary to screen movies. However, the Lincoln Theatre did not begin showing children's movies on Saturdays.

{¶ 13} On January 22, 2013, Capital City and Adrian sued to enforce the declaratory judgment.[1] Plaintiffs alleged that defendants were violating the declaratory judgment and breaching the restrictive covenant by not showing Saturday children's movies. Plaintiffs premised their suit upon R.C. 2721.09, which states:

> Subject to section 2721.16 of the Revised Code, whenever necessary or proper, a court of record may grant further relief based on a declaratory judgment or decree previously granted under this chapter. The application for further relief shall be by a complaint filed in a court of record with jurisdiction to grant further relief. If the application is sufficient, the court, on reasonable notice, shall require any adverse party whose rights have been adjudicated by the declaratory judgment or decree to show cause why further relief should not be granted forthwith.

{¶ 14} In a decision and entry dated January 8, 2014, the court determined that plaintiffs were entitled to a show cause hearing based on the allegations contained in the complaint. At the March 31, 2014 show cause hearing, the Lincoln Theatre Association

---

[1] Prior to the January 2013 suit, plaintiffs filed an action seeking the same relief, but omitting the Lincoln Theatre Association and CAPA as defendants. The trial court dismissed that action for failure to join the Lincoln Theatre Association as a necessary party, and plaintiffs appealed the dismissal. We affirmed the trial court's judgment. *Capital City Community Redevelopment Corp. v. Columbus*, 10th Dist. No. 12AP-257, 2012-Ohio-6025, ¶ 21, 24. Thereafter, plaintiffs filed the instant action.

pointed out that paragraph 9(a) only required the showing of children's movies "for as long as feasible." The Lincoln Theatre Association had determined that screening double features of children's movies on Saturdays was not feasible, and consequently, it had not established a Saturday children's movie series. During the show cause hearing, the Lincoln Theatre Association focused on providing proof to support its feasibility determination.

{¶ 15} The Lincoln Theatre Association first called Chad Whittington, CAPA's chief financial officer, as a witness. Whittington explained that, pursuant to the contract between the Lincoln Theatre Association and CAPA, he oversaw the Lincoln Theatre Association's finances. Whittington then testified regarding the estimated costs of a Saturday children's movie series and the Lincoln Theatre Association's operating revenues and expenses for 2009 through 2013. Based on this evidence, Whittington testified that, from a financial perspective, staging a Saturday children's movie series was not feasible.

{¶ 16} The Lincoln Theatre Association's second witness, Larry James, concurred with Whittington's testimony. James is the chairman and president of the Lincoln Theatre Association Board, and he previously served as the president of the Martin Luther King Jr. Center for Performing and Cultural Arts, as well as a board member or trustee for a number of Columbus institutions. James solicited donations to reconstruct the Lincoln Theatre and fund its first five years of operation. James testified that when he discussed programming options with potential benefactors, those benefactors universally refused to fund the showing of movies. Given the refusal to fund movies, James stated that the Lincoln Theatre Association faced a choice:

> Were we going to do programming that was going to sustain the type of mission that we thought we had been empowered to in educating and giving experience to children? Or were we going to do two movies every Saturday and bankrupt and not be able to solicit the funds?

(Mar. 31, 2014 Tr. at 65.) To ensure its continued existence, the Lincoln Theatre Association chose the former option.

{¶ 17} Plaintiffs presented the testimony of Adrian, who stated that he insisted on the inclusion of paragraph 9(a) in the Real Estate Purchase and Sale Agreement because he believed that movies would aid the development of children living in the King-Lincoln

District. Adrian contended that showing children's movies on Saturdays was feasible because the Lincoln Theatre had the necessary equipment and facilities.

{¶ 18} At the conclusion of the hearing, the trial court withheld its ruling and, instead, ordered the Lincoln Theatre Association to organize a trial Saturday children's movie program. Complying with the trial court's order, the Lincoln Theatre Association scheduled double features of children's movies on eight dates during the summer of 2014. The Lincoln Theatre then screened double features, for the admission price of $1, on May 10, May 24, June 7, July 5, July 12, July 19, August 9, and August 30. Excepting the August 30 double feature, an average of 14 people attended each double feature.[2]

{¶ 19} The parties reconvened for a second hearing on June 17, 2015. The Lincoln Theatre Association presented evidence regarding the trial movie series and, again, asserted that showing children's movies on Saturdays was not feasible due to the costs of such a program. Plaintiffs countered this evidence with the testimony of Len Ford, a fundraising consultant, who opined that the Lincoln Theatre Association could raise money from benefactors to cover the cost of a Saturday children's movie series.

{¶ 20} On September 17, 2015, the trial court issued a decision and entry finding that a children's movie series was not feasible. Consequently, the trial court concluded that defendants were not obligated, pursuant to paragraph 9(a), to produce such a series, and the trial court denied plaintiffs' request that it enforce the declaratory judgment.

{¶ 21} Plaintiffs now appeal the September 17, 2015 judgment, and they assign the following errors:

> First Assignment of Error. The Trial Court erred in denying plaintiffs' complaint to enforce a restrictive covenant and declaratory judgment requiring defendants to provide Saturday movies for children on[c]e the theatre is operational and for as long as feasible, the cost to be $1.00 or less for a double feature.
>
> Second Assignment of Error. The Trial Court erred in holding that plaintiffs had no right to damages and no right to a jury trial.

---

[2] A patron of the Lincoln Theatre purchased 400 tickets to the August 30 double feature and provided those tickets to the community at no cost. One hundred and thirty-four people attended the August 30 double feature.

{¶ 22} By their first assignment of error, plaintiffs argue that the trial court erred in finding that a Saturday children's movie series at the Lincoln Theatre was not feasible and, based on that finding, declining to grant plaintiffs any further relief under R.C. 2721.09. We disagree.

{¶ 23} In order to address plaintiffs' argument, we must initially determine what "feasible" means in the context of paragraph 9(a). Courts apply the ordinary rules of contract construction to interpret a restrictive covenant. *Polaris Owners Assn. v. Solomon Oil Co.*, 5th Dist. No. 14 CAE 11 0075, 2015-Ohio-4948, ¶ 50; *Reinsmith v. Curtis*, 12th Dist. No. CA2014-05-008, 2015-Ohio-573, ¶ 14. Thus, when interpreting a restrictive covenant, a court's primary objective is to determine the parties' intent as reflected by the language used in the restriction. *Hitz v. Flower*, 104 Ohio St. 47, 56 (1922); *Reinsmith* at ¶ 14; *Morgan Woods Homeowners' Assn. v. Wills*, 5th Dist. No. 11 CA 57, 2012-Ohio-233, ¶ 42; *Baker v. Adams*, 3d Dist. No. 8-05-17, 2006-Ohio-3232, ¶ 31; *Karam v. High Hampton Dev.*, 9th Dist. No. 21265, 2003-Ohio-3310, ¶ 22. A court must give the undefined words appearing in the restriction their common, ordinary meaning. *Baker* at ¶ 31; *Karam* at ¶ 22. If the restrictive covenant is clear and unambiguous, a court must enforce the restriction as written. *Wills* at ¶ 42; *Baker* at ¶ 30; *Karam* at ¶ 21. The interpretation of a restrictive covenant is a matter of law, which appellate courts review de novo. *Polaris Owners Assn.* at ¶ 50; *Karam* at ¶ 20.

{¶ 24} Ordinarily, the word "feasible" means "capable of being done, executed, or effected: possible of realization." *Webster's Third New International Dictionary* 831 (2002); *accord Oxford English Dictionary* (online ed. Mar. 2016) (defining "feasible" with regard to a "design, project, etc." as "[c]apable of being done, accomplished or carried out; possible, practicable"). The parties all agree upon this definition. Plaintiffs, however, interpret this definition more narrowly than defendants. Plaintiffs maintain that "feasible" means *physically* capable of being done. Thus, under the plaintiffs' definition, mounting a Saturday children's movie series is feasible because the Lincoln Theatre possesses a projector, screen, and seats for patrons. Plaintiffs reject the contention that evaluating whether something is "capable of being done" also requires consideration of whether sufficient funds exist to realize the thing to be done.

{¶ 25} We find that plaintiffs' definition deviates from the ordinary, common definition of "feasible." That definition does not limit the determination of capability to whether the equipment, facilities, and other tangible items exist to accomplish the thing to be done. Because the definition lacks such limitation, determining if a thing is "feasible" encompasses any and all factors that impact whether the thing is capable of being done. Consequently, the existence or absence of the funds necessary to accomplish the thing to be done affects whether that thing is feasible.

{¶ 26} When the word "feasible" is given its plain, ordinary meaning, the restrictive covenant contains no ambiguity. Thus, we must apply it as written in reviewing the trial court's conclusion that a Saturday children's movie series was not feasible given the evidence presented in this case.

{¶ 27} At the two show cause hearings, the Lincoln Theatre Association presented evidence that the costs of staging a Saturday children's movie series made such an endeavor unfeasible. Plaintiffs contended that this evidence was not persuasive, and they adduced evidence that contradicted the Lincoln Theatre Association's evidence. The trial court found the Lincoln Theatre Association's evidence more convincing than plaintiffs' evidence.

{¶ 28} A court of appeals must defer to a trial court's findings of fact where competent, credible evidence supports those findings. *Myers v. Garson*, 66 Ohio St.3d 610, 614 (1993). Such deference is owed because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 29} With this standard in mind, we begin our review with the evidence offered to support the contention that the Lincoln Theatre Association cannot afford the costs associated with a Saturday children's movie series.[3] Staging a Saturday children's movie series requires expenditures for advertising the series, DVD rental, engaging the services

---

[3] In section 5.02 of the agreement wherein the Lincoln Theatre Association leased the Lincoln Theatre from the city, the Lincoln Theatre Association assumed the cost of "comply[ing] with all laws, orders, and ordinances applicable to the [Lincoln Theatre] premises." (Defs.' Ex. 1.) This section, therefore, obligates the Lincoln Theatre Association to absorb the cost of complying with the declaratory judgment. Consequently, we review the Lincoln Theatre Association's finances to determine whether it has the necessary funds to render feasible the staging of a Saturday children's movie series.

of a projectionist and other staff, security during the events, and cleaning after the events. During the summer of 2014, the Lincoln Theatre Association showed double features on eight Saturdays. At the June 17, 2015 hearing, the Lincoln Theatre Association introduced into evidence a report summarizing the expenses paid and revenues received for each double feature. According to the figures contained in that report, the direct cost of each double feature averaged $916.02.[4] Therefore, if forced to show movies throughout the year, the Lincoln Theatre Association would have to expend an average of $47,633.04 per year ($916.02 x 52 weeks in a year = $47,633.04).

{¶ 30} In addition to the direct costs of a Saturday children's movie series, the overall cost must include opportunity costs. If children's movies are shown every Saturday, the Lincoln Theatre Association cannot rent the theatre for performances and other events on those days. Historically, the theatre is booked on most Saturdays throughout the year for an average fee of $1,200. In 2012, the theatre was available for Saturday use only 15 of 52 weeks.[5] Based on that frequency of use, the Lincoln Theatre Association would incur $44,400 in lost opportunity costs per year if it staged a Saturday children's movie series ($1,200 x 37 weeks of lost theatre rental = $44,400).

{¶ 31} Together, the direct and opportunity costs of showing Saturday children's movies would exceed $100,000 per year. James testified that the Lincoln Theatre Association "can not [sic] afford to lose a hundred thousand dollars plus a year [and would] take a nosedive" if forced to incur that loss. (Mar. 31, 2014 Tr. at 85.) According to James, obligating the Lincoln Theatre Association to show Saturday children's movies would result in the organization's bankruptcy.

{¶ 32} Plaintiffs contest James' testimony. Plaintiffs assert that, in fact, the Lincoln Theatre Association has sufficient funds to absorb the projected loss arising from a Saturday children's movie series. Plaintiffs point to the Lincoln Theatre Association's tax records, which show that the Lincoln Theatre Association had "[s]avings and

---

[4] We reached this amount by subtracting the total expenses of the movie series from the total revenues received from ticket sales and dividing the result by eight, the number of double features shown.

[5] The record contains a schedule that lists the Saturdays on which the theatre was rented beginning with Saturday, July 16, 2011 and ending with Saturday, October 12, 2013. As 2012 is the only calendar year completely contained within that schedule, we use 2012 to gauge the theatre's use.

temporary cash investments" of $879,244 on July 1, 2009; $557,068 on June 30, 2010; $948,717 on July 1, 2011; and $733,310 on June 30, 2012. (Pls.' Ex. O & P.)

{¶ 33} James testified that, while the tax figures are correct, they are also misleading because they combine the funds for operation of the Lincoln Theatre with the funds collected to pay the $2,639,000 debt arising from the reconstruction of the theatre. The Lincoln Theatre operates on income generated from rental of its facilities, events presented by the Lincoln Theatre Association, as well as donations, memberships, and grants. That income amounts to approximately $500,000 per year, not the larger amounts listed in the tax returns.

{¶ 34} However, even with $500,000 of income per year, the Lincoln Theatre Association does not have the funds to underwrite money-losing programming. The operation of the theatre consumes the Lincoln Theatre Association's income. In fiscal years 2011 and 2013, the Lincoln Theatre Association posted net gains of only $16,914 and $8,568, respectively. In fiscal year 2012, the Lincoln Theatre Association had a net loss of $33,907.[6] Given the constraints of the Lincoln Theatre Association's budget, James testified that the Lincoln Theatre Association cannot offer any non-profitable programming unless a benefactor "write[s] the check" to cover the cost of the programming. (Mar. 31, 2014 Tr. at 67.)

{¶ 35} Plaintiffs contend that the Lincoln Theatre Association can find such benefactors for a Saturday children's movie series. For this proposition, plaintiffs rely on the testimony of Len Ford, a fundraising consultant. Ford testified that the Lincoln Theatre Association could acquire the funds for a Saturday children's movie series through seeking donations from organizations and individuals, special-event fundraising, and obtaining grants and corporate or individual sponsors. However, on cross-examination, Ford admitted that he had no experience with attempting to obtain funding for a children's movie series. James, on the other hand, has solicited funding for children's movies through grants and Columbus-based corporations and organizations. None of James' efforts have succeeded; as James put it, when seeking funding, "children's movies [are] dead at hello." (June 17, 2015 Tr. at 28.)

---

[6] CAPA assisted the Lincoln Theatre Association in improving its bottom line by forgiving management fees owed to CAPA in fiscal year 2012 (i.e., $70,000) and fiscal year 2013 (i.e., $30,000).

{¶ 36} Due to James' greater experience, the trial court found James' testimony more persuasive than Ford's. Plaintiffs argue that the trial court's evaluation is flawed because it failed to take into account James' long-standing hostility to a Saturday children's movie series. We find no error on the part of the trial court in finding James' testimony to be credible and in relying on it. James explained that donors prefer children's programming that improves quality of life over showing children movies they could view at home. We find this explanation reasonable. Thus, we reject plaintiffs' contention that James' testimony regarding fundraising should be disbelieved.

{¶ 37} We find no error in the trial court's assessment of the evidence. There is competent, credible evidence that the costs of a Saturday children's movie series render it unfeasible.

{¶ 38} As a final argument, plaintiffs urge that if it is not feasible to show Saturday children's movies, we must find that the trial court erred by not ordering the Lincoln Theatre Association to show children's movies on a more limited basis. Plaintiffs did not raise this argument in the trial court, so consequently, plaintiffs waived it and cannot assert it on appeal. *See Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34. Moreover, plaintiffs' argument relies on the cy pres doctrine, which courts use to revise charitable trusts when fulfilling the settlor's original intent becomes impossible, inexpedient, or impracticable. *See Daloia v. Franciscan Health Sys.*, 79 Ohio St.3d 98, 106 (1997). We have found no Ohio precedent applying this doctrine to restrictive covenants, and plaintiffs provide us with no reason to extend the application of the doctrine.

{¶ 39} Because showing Saturday children's movies is not feasible, defendants have not disobeyed the declaratory judgment directing them to comply with paragraph 9(a). Consequently, the trial court did not err in denying plaintiffs further relief under R.C. 2721.09. We thus overrule plaintiffs' first assignment of error.

{¶ 40} By their second assignment of error, plaintiffs argue that the trial court erred in denying them a jury trial on damages. Plaintiffs contend that damages are owed because defendants violated paragraph 9(a) and the declaratory judgment by failing to stage a Saturday children's movie series at the Lincoln Theatre. We have concluded that the trial court did not err in finding no violation of paragraph 9(a) and the declaratory

judgment. This conclusion renders the second assignment of error moot, and consequently, we do not address it.

{¶ 41} For the foregoing reasons, we overrule plaintiffs' first assignment of error, which renders the second assignment of error moot. We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and BRUNNER, JJ., concur.

———————————